IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF OHIO

WESTERN DIVISION

SHELLEY EVANS-MARSHALL,              :

    Plaintiff,                                :

                              Case No. 3:03cv091

      vs.                                   :

                              JUDGE WALTER HERBERT RICE

BOARD OF EDUCATION OF TIPP          :

CITY EXEMPTED VILLAGE SCHOOL

DISTRICT, et al.,                         :

    Defendants.                             :

---

**DECISION AND ENTRY SUSTAINING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT (DOC. #38); JUDGMENT TO BE ENTERED ON BEHALF OF DEFENDANTS AND AGAINST PLAINTIFF; TERMINATION ENTRY**

---

       Plaintiff Shelley Evans-Marshall was formerly employed as a public school

teacher at Tippecanoe High School ("Tipp High School"), by Defendant Board of

Education of Tipp City Exempted Village School District ("Tipp City Board of

Education" or "Board").  Evans-Marshall brings suit against the Tipp City Board of

Education, as well as against Defendants Charles W. Wray ("Wray" or "Principal"),

Principal of Tipp High School, and John T. Zigler ("Zigler" or "Superintendent"),

Superintendent of the Tipp City Exempted Village School District ("School District" or "District"). Doc. #1. Suit is brought against Wray and Zigler only in their individual capacities. Id.

The gravamen of Evans-Marshall's complaint is that the Defendants wrongfully terminated her employment, in retaliation for her exercise of her First Amendment right to make curricular choices, while teaching at Tipp High School. Id. The Defendants move for summary judgment arguing that Evans-Marshall has not set forth a genuine issue of material fact as to the elements of her First Amendment claim and that, even if she has, they have sufficiently alleged that the Board would not have renewed her teaching contract even in the absence of the protected First Amendment conduct. Doc. #38. Further, the Defendants argue that Wray and Zigler are entitled to summary judgment, on the basis of qualified immunity. Id.

Earlier in these proceedings, the Defendants filed a Motion to Dismiss. Doc. #3. The Court overruled that Motion, finding that the Plaintiff had pled sufficient facts which could, should they be proven by a preponderance of evidence at trial, sustain a verdict in favor of the Plaintiff. Doc. #12. The legal analysis in that Decision was based largely on the Sixth Circuit's decision in Cockrel v. Shelby County School District, 270 F.3d 1036 (6th Cir. 2001). Id. The Defendants appealed. The Sixth Circuit affirmed, also based in large part on its previous Cockrel decision, along with the Supreme Court case law that was the

2

underpinning for that case.[1] Evans-Marshall v. Bd. of Educ., 428 F.3d 223 (6th Cir. 2005).[2]

The Court will now consider the Defendants' Motion for Summary Judgment, based on the more developed record that is before it. In so doing, the Court will analyze the Supreme Court's recent First Amendment decision in Garcetti v. Ceballos, 547 U.S. 410, 126 S. Ct. 1951 (2006), which was decided after the Sixth Circuit's previous decision in this case, to see how, if at all, the Garcetti decision impacts Sixth Circuit precedent in this area. To the extent necessary, the

---

[1]The opinion for the Court was written by Judge Cole. Evans-Marshall v. Board of Education, 428 F.3d 223 (6th Cir. 2005). Judge Sutton wrote a concurrence, wherein he concurred in the First Amendment decision, as necessitated by binding Sixth Circuit precedent (primarily as expressed in Cockrel v. Shelby County School District, 270 F.3d 1036, 1048 (6th Cir. 2001)), but opined that the Sixth Circuit "should re-examine its First Amendment jurisprudence in the context of in-class curricular speech," based on a study of the evolving case law of the Supreme Court and other Circuits, in this and related areas (there has yet to be a Supreme Court case directly on point involving teacher in-class curricular speech). Evans-Marshall, 428 F.3d at 234. Judge Zatkoff (sitting by designation from the Eastern District of Michigan) wrote separately, concurring in part and dissenting in part. Id. at 238-40. Judge Zatkoff concurred with Judge Cole's First Amendment decision, "which faithfully applies this circuit's precedent in [Cockrel]," while concurring with Judge Sutton's concurrence, "which calls for a re-examination of this circuit's First Amendment jurisprudence regarding in-class curricular speech." Id. at 238. Judge Zatkoff dissented, however, with the determination regarding qualified immunity, finding no "clearly established" standard for determining a constitutional violation. Id. at 238-40.

[2]As to other proceedings between these parties, Evans-Marshall also brought suit in state court, arguing that the Board had not properly evaluated her performance and did not properly conduct the hearing to determine whether to overturn the Board's previous decision not to renew her contract, in contravention of both the Board's internal policies and Ohio law. Evans-Marshall v. Bd. of Educ., 2003 Ohio App. LEXIS 4496 (Ohio 2nd App. Dist. Sept. 19, 2003). The trial court affirmed the Board's decision and Ohio's Second Appellate District affirmed. Id.

Court will then move to a discussion of the individual Defendants' entitlement to qualified immunity.

I.      SUMMARY JUDGMENT STANDARD

Summary judgment must be entered "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).  The moving party,

> always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which it believes demonstrate the absence of a genuine issue of material fact.

Id. at 323; see also Boretti v. Wiscomb, 930 F.2d 1150, 1156 (6th Cir. 1991).

"Once the moving party has met its initial burden, the nonmoving party must present evidence that creates a genuine issue of material fact making it necessary to resolve the difference at trial." Talley v. Bravo Pitino Rest., Ltd., 61 F.3d 1241, 1245 (6th Cir. 1995); see also Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 (1986).  Once the burden of production has so shifted, the party opposing summary judgment cannot rest on its pleadings or merely reassert its previous allegations, it is not sufficient to "simply show that there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).  Rule 56(e) "requires the nonmoving party to go

4

beyond the [unverified] pleadings" and present some type of evidentiary material in support of its position. <u>Celotex</u>, 477 U.S. at 324. "The plaintiff must present more than a scintilla of evidence in support of his position; the evidence must be such that a jury could reasonably find for the plaintiff." <u>Mich. Prot. & Advocacy Serv., Inc. v. Babin</u>, 18 F.3d 337, 341 (6th Cir. 1994).

Summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56©. Summary judgment shall be denied "[i]f there are . . . 'genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party.'" <u>Hancock v. Dodson</u>, 958 F.2d 1367, 1374 (6th Cir. 1992) (citation omitted). In determining whether a genuine issue of material fact exists, a court must assume as true the evidence of the nonmoving party and draw all reasonable inferences in favor of that party. <u>Anderson</u>, 477 U.S. at 255. If the parties present conflicting evidence, a court may not decide which evidence to believe, by determining which parties' affiants are more credible; rather, credibility determinations must be left to the fact-finder. 10A Wright, Miller & Kane, Federal Practice and Procedure Civil 3d § 2726 (1998).

In ruling on a motion for summary judgment (in other words, in determining whether there is a genuine issue of material fact), "[a] district court is not . . .

obligated to wade through and search the entire record for some specific facts that might support the nonmoving party's claim." InterRoyal Corp. v. Sponseller, 889 F.2d 108, 111 (6th Cir. 1989), cert. denied, 494 U.S. 1091 (1990); see also L.S. Heath & Son, Inc. v. AT&T Info. Sys., Inc., 9 F.3d 561 (7th Cir. 1993); Skotak v. Tenneco Resins, Inc., 953 F.2d 909, 915 n.7 (5th Cir. 1992), cert. denied, 506 U.S. 832 (1992) ("Rule 56 does not impose upon the district court a duty to sift through the record in search of evidence to support a party's opposition to summary judgment . . . ."). Thus, a court is entitled to rely, in determining whether a genuine issue of material fact exists on a particular issue, only upon those portions of the verified pleadings, depositions, answers to interrogatories and admissions on file, together with any affidavits submitted, specifically called to its attention by the parties.


II.    FACTS[3]

       The Tipp Board originally hired Evans-Marshall pursuant to a one-year contract, as a language arts teacher at Tipp High School and as an advisor for the high school's literary magazine, for the 2000-2001 academic year. Doc. #31, Ex. C, pt. 3 at 14-15 (2000-2001 Contract).  That school year passed without

---

       [3]Since this case comes before the Court on the Defendants' Motion for Summary Judgment, the Court sets forth the facts and circumstances giving rise to such Motion in the manner most favorable to the Plaintiff, as the party against whom the Motion is directed. Servo Kinetics, Inc. v. Tokyo Precision Instruments, 475 F.3d 783, 790 (6th Cir. 2007).

6

incident, with Evans-Marshall receiving primarily favorable comments from Principal Wray, on both her written "observations" and "evaluations." Doc. #31, Ex. C, pt. 1 at 22-34 (2000-2001 Written Observations and Evaluations).  The School Board, thus, renewed her contract for the 2001-2002 school year. Doc. #32, Attach. #1 (Zigler Dep.) at 15.

In the fall of 2001, as she had done the previous year, Evans-Marshall choose to supplement her ninth grade English class textbook with a book entitled Siddhartha.[4] Doc. #31, Attach. #1 (Evans-Marshall Dep.) at 25.  This book had originally been purchased by the School District and was made available to teachers as an optional text.[5] Doc. #32, Attach. #1 (Zigler Dep.) at 16-17.  Also, in conjunction with a study of the book Fahrenheit 415 (a book about government censorship), Evans-Marshall had presented her ninth grade English class with an assignment concerning the American Library Association's list of the 100 most challenged books in the United States, during which some of the students elected to read a book off of that list entitled Heather Has Two Mommies, about homosexual family relationships. Doc. #31, Attach. #1 (Evans-Marshall Dep.) at 76-78.

---

[4]The themes of Siddhartha include spirituality, Buddhism, romantic relationships, personal growth and family relationships. Doc. #31, Attach. #1 (Evans-Marshall Dep.) at 101.

[5]Siddhartha was purchased by the school district in 1985 and was originally part of the social studies curriculum. Doc. #32, Attach. #1 (Zigler Dep.) at 18, 30.

At the Tipp Board meeting held on October 22, 2001 ("October Board meeting"), approximately four or five community members voiced disapproval of the content of some of the materials that were being taught in the junior and senior high schools, including Siddhartha and the discussions involving the 100 most challenged books. Doc. #32, Attach. #1 (Zigler Dep.) at 19-25, 70.  At that meeting and in response to Evans-Marshall being named as the teacher who had assigned Siddhartha, a Board member explained that that book (and at least one other book being discussed, which is not related to this case) had been purchased by the District, so their selection had nothing to do with the individual teachers who had assigned them. Id. at 16-17, 25.  The Superintendent also explained that parents could request an alternative assignment, if they objected to any book that was assigned to their children. Id. at 23.

The following day, Principal Wray convened a meeting of the English faculty at the high school, during which he told Evans-Marshall that she was on the "hot seat" for parent complaints about teaching Siddhartha. Doc. #31, Attach. #1 (Evans-Marshall Dep.) at 64.  Approximately two weeks later, the Principal conducted his first formal "observation" of the Plaintiff for that school year and gave her all favorable comments. Doc. #31, Ex. C, pt. 2 at 5 (Nov. 13, 2001, Teacher Observation Log).

In response to the parental complaint about the Heather book, the Principal asked Evans-Marshall to choose a different book from the 100 most challenged

8

book list, which she did. Doc. #33, Attach. #1 (Wray Dep.) at 70-73. As to

Siddhartha, Evans-Marshall continued to teach that book. According to her,

however, Principal Wray told her that he objected to her selection of that book, as

well as to the classroom discussions that went along with teaching the themes of

the book.[6] Doc. #31, Attach. #1 (Evans-Marshall Dep.) at 64-65; 74-75; 100-01.

_____

[6]In contrast, Principal Wray testifies that he encouraged Evans-Marshall on a
couple of occasions to continue teaching the book. Doc. #33, Attach. #1 (Wray
Dep.) at 92-93. At some point in time, Evans-Marshall approached Superintendent
Zigler, because she felt that the Principal was unfairly monitoring her teaching
methods, based on his displeasure with her teaching Siddhartha. The
Superintendent testifies that he assured her that was not the case. Doc. #32,
Attach. #1 (Zigler Dep.) at 75.
        At the hearing, at which the Board affirmed the decision not to renew Evans-
Marshall's contract, the transcript indicates that the Board member who concluded
the hearing and presented the non-renewal decision stated as follows:

> When we received the recommendation from the administration not to
> renew Ms. Evans-Marshall's contract, we didn't rubberstamp that
> request. It was a difficult decision precisely because we knew that
> that decision would be interpreted as being because of the reading
> material and class assignments that Mrs. Evans-Marshall used. And
> we did not want that to be the case.
>
> We were concerned that this decision may have an effect on the
> teachers and make them hesitant to assign works of literature to our
> students that are challenging and raise complex issues.
>
> And I personally believe that Siddhartha is a great work of literature.
> It's from a Nobel Prize winning author and I support the use of that
> book in the classroom as does our administration. That is why we . . .
> gave Superintendent Zigler strict instructions to inform [the] English
> department of our support of that particular book and the importance
> of exposing students to books that expand their minds and challenge
> ideas that may not otherwise be addressed.

Doc. #37, Attach. #3 at 50 (Tr. of Bd. Mtg., pt. 2, May 13, 2002).

On November 26, 2001, the School Board convened another meeting
("November Board meeting"), during which much discussion ensued about the
appropriateness of certain books, in the junior and senior high classrooms and
libraries. Doc. #37, Ex. #1 (Nov. 26, 2001, Bd. Mtg. DVD; filed manually).  The
primary focus of the parents' concerns during that meeting, which lasted 1 hour
and 50 minutes, was the accelerated reader list, which was a part of the junior
high school library replenishment system. Id.  Although the Board immediately
decided to remove some of the junior high library books that were objected to, it
reiterated its intent to retain textbooks that had been approved of and purchased
by the Board and also re-explained its policy on parents requesting alternative
textbooks, if they objected. Id.  Despite the general focus on the junior high school
library books, one parent of a ninth grade student specifically mentioned
Siddhartha, complaining that she had requested an alternative assignment for her
daughter, but that the alternative book was too elementary,[7] that her daughter felt
as if she had been punished for seeking an alternative assignment, and that the
assignment for the alternative book was incomprehensible to both the student and
the parent. Id.

At some time, an office aide making photo-copies made the Principal aware
that Evans-Marshall was making available to the juniors and seniors in her creative

---

[7]Evans-Marshall assigned an alternative book that was appropriate for 9-12
year old readers, whereas ninth grade student are typically 14-15 years old. See
Doc. #31, Attach. #1 (Evans-Marshall Dep.) at 30.

10

writing class two student-authored articles (among others), to use as writing samples in the event they needed them. Doc. #31, Attach. #1 (Evans-Marshall Dep.) at 87, 125-26.  One of the articles portrayed a graphic, first-hand description of a rape and the other article described the first-hand accounts of a murderer, including his slaying of a priest, along with the destruction of various religious symbols, such as the "decapitation" of a crucifix. Doc. #33, Ex. A.  Upon the Principal's discovery of these materials, which he considered to be inappropriate for high school instruction, a heated discussion ensued between the Principal and Evans-Marshall, during which she stated something to the effect of, "I suppose anything I want copied, I have to run through Daddy to get checked." Doc. #33, Attach. #1 (Wray Dep.) at 77-80.

Beginning with the written "observation" the Principal made of Evans-Marshall's class on December 13, 2001, the relationship between the two of them began showing outward signs of contentiousness.  On his written "observation log" for that visit, two of the six comments the Principal made were critical.  In particular, he noted that "any material containing graphic violence, sexual themes, profanity, suicide, drugs and alcohol need[s] to be discussed with your department chairs before being used in class." Doc. #31, Ex. C, pt. 2 at 6 (Teacher Observation Log, dtd. Dec. 13, 2001).  By the end of that school year, the Principal recommended to the Superintendent that Evans-Marshall's teaching contract not be renewed. Doc. #31, Ex. C, pt. 1 at 9-13 (Perf. Eval, dtd. March 21, 2002).  The

11

Superintendent accepted the non-renewal recommendation and the Board eventually approved it. Doc. #32, Attach. #1 (Zigler Dep.) at 93-97 (as to Superintendent); Doc. #32, Ex. D at 24-26 (Bd. Minutes, dtd. Mar. 25, 2002) (as to Board).  The Board later affirmed its decision at a special Board meeting, the purpose of which was to have a statutory hearing on Evans-Marshall's non-renewal, in accordance with Ohio statutory law.[8]


III.    PLAINTIFF'S *PRIMA FACIE* CASE OF FIRST AMENDMENT RETALIATION

    A.    Pre-Garcetti Sixth Circuit First Amendment Precedent

    In its previous opinion in this case, the Sixth Circuit set forth a road-map as to the pre-Garcetti (and perhaps the post-Garcetti?) approach to First Amendment cases pertaining to in-class teacher speech.  Therein, the Court explained that, in order to establish a *prima facie* case of First Amendment retaliation, a public school teacher must allege:

    (1) that [she] was engaged in a constitutionally protected activity;

    (2) that the defendant's adverse action caused [her] to suffer an injury that would likely chill a person of ordinary firmness from continuing in

_____

[8]The reason given by the District for not renewing Evans-Marshall's contract was that she refused to communicate with the administration and refused to be a team player. Doc. #37, Attach. #3 at 51 (Tr. of Bd. Mtg., pt. 2, May 13, 2002). Evans-Marshall, on the other hand, contended that the decision was in retaliation for her curricular choices. Doc. #37, Attach. #2 at 6-7 (Tr. of Bd. Mtg., pt. 1, May 13, 2002).

that activity; and

(3) that the adverse action was motivated at least in part as a response to the exercise of [her] constitutional rights.

Evans-Marshall v. Bd. of Educ., 428 F.3d 223, 228 (6th Cir. 2005) (quoting

Cockrel v. Shelby County Sch. Dist., 270 F.3d 1036, 1048 (6th Cir. 2001)).  The

Court will now provide a brief discussion of each of these elements.

       1.    Whether a Plaintiff was Engaged in Constitutionally Protected Activity

The first element of a plaintiff's *prima facie* case is the only one that is

possibly impacted by the recent Supreme Court decision in Garcetti.  The impact, if

any, of that decision, will be explained later in this Opinion.  For purposes of the

present discussion, the Court will focus on Supreme Court and Sixth Circuit

guidance prior to Garcetti.

In order to establish that a plaintiff was engaged in a constitutionally

protected activity, a court must first determine whether the plaintiff's activity

constituted "speech" within the meaning of the First Amendment. Evans-Marshall,

428 F.3d at 229 (citing Cockrel, 270 F.3d at 1048).  If so, the court moves to a

two-part analysis, deciding first whether the plaintiff "was disciplined for speech

that was directed toward an issue of public concern" (it is this step to which

Garcetti potentially pertains) and then whether the plaintiff's "interest in speaking

13

as [she] did outweighed the [school's] interest in regulating [her] speech." Id. (quoting Cockrel, 270 F.3d at 1050 and Hardy v. Jefferson Cmty. College, 260 F.3d 671, 678 (6th Cir. 2001)).

This approach has been referred to as the Pickering-Connick balancing test, in that it was first announced by the Supreme Court in Pickering v. Board of Education, 391 U.S. 563, 88 S. Ct. 1731 (1968), and later refined in Connick v. Myers, 461 U.S. 138, 103 S. Ct. 1684 (1983).  In Pickering, the Supreme Court explained that a balance must be struck between "the interests of the teacher, as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." Pickering, 391 U.S. at 568.  In Connick, the Court instructed that courts must first determine whether "a public employee speaks . . . as a citizen upon matters of public concern [or] as an employee upon matters only of personal interest." Connick, 461 U.S. at 147.  If the employee is speaking as an employee upon matters only of personal interest, such speech is generally not afforded First Amendment protection, whereas if she is speaking as a citizen upon matters of public concern, it is. See id.

        2.      Whether a Defendant's Adverse Action Caused Plaintiff to Suffer Injury that would Likely Chill a Person of Ordinary Firmness from Continuing in Activity

The second element of a plaintiff's *prima facie* case requires a showing that

14

the defendant's adverse action caused the plaintiff to suffer an injury that would chill a person of ordinary firmness from continuing in that activity. Evans-Marshall, 428 F.3d at 228.  The Sixth Circuit has held that non-renewal of a teaching contract is "an injury that would likely chill a person of ordinary firmness from continuing in [the] activity." Id. at 232 (quoting Cockrel, 270 F.3d at 1055).


3.    Whether Adverse Action was Motivated at Least in Part as
      Response to Exercise of Constitutional Rights

The final element of a First Amendment retaliation claim requires a plaintiff to show that the adverse action taken against her was motivated at least in part as a response to the exercise of her constitutional rights. Evans-Marshall v. Bd. of Educ., 428 F.3d 223, 228 (6th Cir. 2005).  The Sixth Circuit instructs that "the nonmoving party may not rely on the mere fact that an adverse employment action followed speech that the employer would have liked to prevent.  Rather, the employee must link the speech in question to the defendant's decision to dismiss her." Cockrel v. Shelby County Sch. Dist., 270 F.3d 1036, 1055 (6th Cir. 2001) (quoting Bailey v. Floyd County Bd. of Educ., 106 F.3d 135, 145 (6th Cir. 1997)). "In other words," the Court continues, "to survive defendants' motion for summary judgment, [the plaintiff] must present sufficient evidence to allow a reasonable factfinder to conclude, by a preponderance of the evidence, that her speech, at least in part, motivated the defendants to discharge her." Id. (citing Bailey, 106 F.3d at 145).

15

B.     Impact of Garcetti on Sixth Circuit Precedent

In Garcetti v. Ceballos, 547 U.S. 410, 126 S. Ct. 1951 (2006), the plaintiff, Ceballos, was a deputy district attorney.  The controversy began when Ceballos examined an affidavit that had been prepared to obtain a search warrant in a criminal case and determined that there were serious misrepresentations thereon. Id. at 413-14.  He then wrote a memorandum to his supervisors, recommending that the case be dismissed, due to the erroneously prepared affidavit. Id. at 414. The supervisor nevertheless proceeded with the prosecution of the case. Id. Ceballos ultimately brought suit alleging that he had been subjected to retaliatory employment actions (i.e., reassignment from his calendar deputy position to a trial deputy position, transfer to another courthouse and denial of a promotion) as a result of preparing the memorandum. Id. at 414-15.

The Supreme Court framed the issue before it as being "whether the First Amendment protects a government employee from discipline based on speech made pursuant to the employee's official duties." Id. at 413.  In resolving this issue, the Court initially looked at its earlier decisions in Pickering and Connick and highlighted the two inquiries that guide courts in the interpretation of the constitutional protections accorded to public employee speech.

> The first [inquiry] requires determining whether the employee spoke as
> a citizen on a matter of public concern.  If the answer is no, the
> employee has no First Amendment cause of action based on his or her
> employer's reaction to the speech.  If the answer is yes, then the

16

> possibility of a First Amendment claim arises. The question becomes whether the relevant government entity had an adequate justification for treating the employee differently from any other member of the general public.

Id. at 418 (citing Pickering v. Board of Education, 391 U.S. 563, 568, 88 S. Ct. 1731 (1968) and Connick v. Myers, 461 U.S. 138, 147, 103 S. Ct. 1684 (1983)). The Court then went on to explain that "this consideration reflects the importance of the relationship between the speaker's expressions and employment." Id. "A government entity has broader discretion to restrict speech when it acts in its role as employer, but the restrictions it imposes must be directed at speech that has some potential to affect the entity's operations." Id.

The Court ultimately determined that the controlling factor in these cases is whether public employees' expressions are made pursuant to their duties as employees, holding that "when public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline." Id. at 421. Finding that Ceballos, in that case, wrote his memorandum because "that is part of what he, as a . . . deputy, was employed to do," the Court concluded that his speech was not entitled to First Amendment protection. Id. at 421-22.

In Justice Souter's dissenting opinion, one of the concerns expressed was the breadth of the majority's holding, specifically as it might apply to certain

17

academic freedom cases.[9]

> This ostensible domain beyond the pale of the First Amendment is
> spacious enough to include even the teaching of a public university
> professor, and I have to hope that today's majority does not mean to
> imperil First Amendment protection of academic freedom in public
> colleges and universities, whose teachers necessarily speak and write
> "pursuant to . . . official duties."

Id. at 712 (emphasis added) (quoting and citing Grutter v. Bollinger, 539 U.S. 306,

329, 123 S. Ct. 2325 (2003); Keyishian v. Board of Regents, 385 U.S. 589, 603,

87 S. Ct. 675 (1967); Sweezy v. New Hampshire, 354 U.S. 234, 250, 77 S. Ct.

1203 (1957) (explanatory parentheticals omitted)).  In response to this concern,

the majority concluded its opinion with the following caveat:

> Justice Souter suggests today's decision may have important
> ramifications for academic freedom, at least as a constitutional value
> . . . .  There is some argument that expression related to academic
> scholarship or classroom instruction implicates additional constitutional
> interests that are not fully accounted for by this Court's customary
> employee-speech jurisprudence.  We need not, and for that reason do
> not, decide whether the analysis we conduct today would apply in the
> same manner to a case involving speech related to scholarship or
> teaching.

Id. at 425 (emphasis added).  It is important to note that while Justice Souter's

concerns were specifically directed to the university setting (focusing on the

teachings of "public university professors" and academic freedoms found in "public

---

[9]The majority opinion was written by Justice Kennedy and joined by Chief
Justice Roberts and Justices Scalia, Thomas and Alito.  There were three separate
dissenting opinions - - - one by Justice Stevens, one by Justices Souter and
Ginsburg, and one by Justice Breyer.

colleges and universities"), the majority's language is far broader in that it pertains to "speech related to scholarship or teaching."

        C.      Application of Legal Standards to Present Case

As just explained, in Garcetti, the Supreme Court refined the first phase of the Pickering-Connick analysis (whether the employee was disciplined for speech that was made as a citizen and directed toward an issue of public concern) by directing the focus to whether the public employee made the statement pursuant to his official duties. Garcetti, 547 U.S. at 421-22; see also Weisbarth v. Geauga Park Dist., 499 F.3d 538, 542 (6th Cir. 2007) (noting that Garcetti clarified the "as a citizen" part of this analysis). The question before this Court, then, is whether Garcetti is applicable to the facts of the present case. If so, the resolution of this case will be an easy one, in that it is hard to imagine how a public high school teacher's curricular speech is not made "pursuant to her official duties," since that is precisely what she is employed to do. Mayer v. Monroe County Cmty. Sch. Corp., 474 F.3d 477, 479 (7th Cir.), cert. denied, 128 S. Ct. 160 (2007) (holding that school boards hire teachers specifically for their curricular speech).

The only two Circuits to have addressed this issue so far have been the Seventh and the Fourth Circuits. The Seventh Circuit determined that Garcetti applies in the context of the classroom speech of K-12 public school teachers, while the Fourth Circuit determined that it did not. Contrast Mayer, 474 F.3d 477

19

(7th Cir. 2007)[10] (finding that "Garcetti applie[d] directly," based on Seventh Circuit precedent that held that public school students, who are a captive audience, should not be subjected to teachers' idiosyncratic perspectives; rather, elected school boards should make policies about teaching contentious issues) with Lee v. York County Sch. Div., 484 F.3d 687, 695 n.11 (4th Cir.), cert. denied, 128 S. Ct. 387 (2007) (continuing to apply traditional Pickering-Connick approach, because the Supreme Court did not "explicitly . . . decide whether [the Garcetti] analysis would apply in the same manner to a case involving speech related to teaching"); see also Pittman v. Cuyahoga Valley Career Ctr., 451 F. Supp. 2d 905, 929 (N.D. Ohio 2006) (refusing to resolve the question of the applicability of Garcetti to public school teacher case and concluding that the case was resolved the same under both Garcetti and traditional Pickering-Connick analysis).

Based on the explicit caveat in the majority opinion of Garcetti that the Court's decision therein did not necessarily apply "in the same manner to a case involving speech related to scholarship or teaching," Garcetti, 547 U.S. at 425, this Court agrees with the Fourth Circuit that it is not clear that Garcetti necessarily applies to the facts of this case.[11]  Thus, absent Sixth Circuit or further Supreme

---

[10]See also Samuelson v. Laporte Cmty. Sch. Corp., 526 F.3d 1046, 1052 (7th Cir. 2008) (in a prior restraint case, holding that speech which was covered by a policy that required that concerns regarding teachers' job responsibilities be addressed through the chain of command was grounded in the public employee's professional duties and therefore not protected by the First Amendment).

[11]The Defendants argue that the Supreme Court has already concluded that the concept of "academic freedom" does not apply to elementary and secondary

Court guidance to the contrary, this Court will continue to apply the traditional
Pickering-Connick approach to cases involving in-class speech by primary and
secondary public school teachers.

The Court, therefore, returns to the elements of a traditional *prima facie* case
of First Amendment retaliation, as set forth in the original Sixth Circuit decision in
this case, in order to decide if there is a genuine issue of material fact as to any of
those elements.

Before beginning this analysis, the Court will first distill the lengthy
arguments made by the parties, in order to hone in on which "speech" is actually in
dispute.  An initial reading of the Complaint indicated that the speech in question
apparently consisted of the Plaintiff's teaching of the books <u>Siddhartha</u>, <u>Fahrenheit
451</u> and <u>To Kill a Mockingbird</u>, and the viewing of the movie <u>Romeo and Juliet</u>.
Doc. #1 ¶¶ 17, 20.  A review of the briefs submitted in support of and in
opposition to the Defendants' Motion for Summary Judgment, however, indicates
that the disputed speech actually consists of the books <u>Siddhartha</u> and <u>Heather Has
Two Mommies</u>, the <u>Romeo and Juliet</u> movie and the two student-authored
stories.[12]

_____

education. Doc. #44 at 8 (citing <u>Edwards v. Aguillard</u>, 482 U.S. 578, 586 n.6, 107
S. Ct. 2573 (1987) and <u>Illinois ex rel. McCollum v. Bd. of Ed.</u>, 333 U.S. 203, 231,
68 S. Ct. 461 (1948)).  While this may be true, the <u>Garcetti</u> Court's caveat applied
to "case[s] involving speech related to <u>scholarship or teaching</u>," which this Court
understands to be considerably broader than cases involving "academic freedom."

[12]As to <u>Fahrenheit 415</u> (a book about government censorship), the Plaintiff
does not allege that the Defendants disapproved of the fact that she taught that

1.    Whether Plaintiff was Engaged in Constitutionally Protected
      Activity

The Sixth Circuit previously determined that the Plaintiff's conduct, in this

case, constituted "speech," because the disputed materials (as indicated in the

Complaint) were "clearly protected by the First Amendment." Evans-Marshall, 428

F.3d at 230.  Further, Sixth Circuit precedent "establishes that the assignment by a

public school teacher of protected material is itself 'speech' within the meaning of

the First Amendment." Id. (citing Cockrel, 270 F.3d at 1049).  The parties do not

argue this point, in their summary judgment memoranda.  In accordance with the

Sixth Circuit's previous determination, as published works, the Heather book, like

Siddhartha and Romeo and Juliet, would be considered speech. See

Evans-Marshall, 428 F.3d at 230 (citing Metzger v. Pearcy, 393 F.2d 202, 204

(7th Cir. 1968) for the proposition that movies and books "are protected by the

constitutional guarantees of freedom of speech and press").  Likewise, the two

student-authored stories would be considered speech, under both Supreme Court

and Sixth Circuit precedent. Hazelwood Sch. Dist. v. Kuhlmeier, 484 U.S. 260,

273, 108 S. Ct. 562 (1988) (considering student articles submitted for publication

--------------------------------------------------

book.  Rather, the Plaintiff asserts that the disapproval was focused on her method
of teaching the theme of that book, to include, in particular, the teaching of
Heather Has Two Mommies, a book on the list of the 100 most challenged books.
See Doc. #41 (Pl.'s Mem. Opp'n) at 11, 30; Doc. #31, Attach. #1 (Evans-Marshall
Dep.) at 100-01.
        Other than the Plaintiff's initial statement in her Complaint that she taught
the book To Kill a Mockingbird, there are no facts alleged either in the Complaint or
in the summary judgment briefs regarding this book.

in school newspaper as "speech"); Curry v. Hensiner, 513 F.3d 570, 577 (6th Cir.

Mich. 2008) (considering candy cane pipe-cleaner ornament, made by elementary

school student, to be "speech"). Having found that all of the disputed materials are

"speech," the Court will now turn to the two parts of the Pickering-Connick

balancing test: whether the speech was directed toward an issue of public concern

and whether the Plaintiff's interest in speaking as she did outweighed the

Defendants' interest in disciplining her for such speech.

        a.     Speech Directed Toward Issue of Public Concern

In determining whether the Plaintiff was disciplined for speech that was

directed toward an issue of public concern,[13] the previous Sixth Circuit opinion in

this case, while addressing Siddhartha and Romeo & Juliet, drew the inference that

the Plaintiff taught the main themes of these works and concluded that such

content is clearly a matter of public concern. Evans-Marshall, 428 F.3d at 230-31.

In so concluding, the Court cited Hardy v. Jefferson Cmty. College, 260 F.3d 671,

679 (6th Cir. 2001), for the proposition that "race, gender, and power conflicts in

our society" are "matters of overwhelming public concern" (these themes were

portrayed in To Kill a Mockingbird, the teaching of which is no longer a matter of

---

[13]To reiterate, the Sixth Circuit's traditional approach is to focus here on whether the speech "touched on a matter of public concern," whereas the Garcetti approach is to focus on "whether public employees' expressions are made pursuant to their duties as employees." Garcetti, 547 U.S. at 421; Evans-Marshall, 428 F.3d at 230.

dispute herein) and added that the main themes of the other materials (spirituality, in Siddhartha, and the intersection of love and politics, in Romeo and Juliet) were similarly matters of public concern. Evans-Marshall, 428 F.3d at 231.

The Defendants do not contest this determination, in their memoranda supporting their Motion for Summary Judgment (rather, they argue that the Court should rule in their favor, as a result of the application of the second part of the Pickering-Connick test, as described below). See Doc. #38 at 30-34; Doc. #44 at 11. On this point, the Plaintiff argues that the controversial themes (homosexuality, drug abuse, rape, religious killing and destruction of religious objects) in the materials she assigned, including the Heather book and the writing samples of the two students, were topics of local, national and international concern, as evidenced by reading daily reports in the media. Doc. #41 at 32-34.

The facts of this case indicate that the Plaintiff did teach the major themes of Siddhartha and Romeo & Juliet, as assumed by the Appellate Court. Thus, the Court is left with the Sixth Circuit's previous holding, as to the teaching of these materials being directed toward issues of public concern. The only additional facts to consider, on this point, are the teachings of the Heather book (dealing with homosexual families) and the two student-authored stories (pertaining to rape and the murder of a priest/destruction of religious materials). Viewing these themes in the same vein as the Appellate Court viewed the themes of the other materials leads to the conclusion that these additional materials also pertain to matters of

24

public concern, it being hard to distinguish homosexuality, rape and religious violence from the other themes, as they all receive prime exposure in the media's coverage of today's local and world events.  Thus, the Court concludes that the Plaintiff's speech touched on matters of public concern.


> b.      Whether Plaintiff's Interest in Speaking as She Did
> Outweighed Defendants' Interest in Disciplining Her for
> Such Speech

Having decided that the speech in question was directed toward issues of public concern, the Court now turns to the second part of the Pickering-Connick analysis - - - whether the Plaintiff's interest in speaking as she did outweighed the Board's interest in disciplining her for such speech.  In the Evans-Marshall appellate decision, the Sixth Circuit determined that it was premature, at the motion to dismiss stage of the litigation, to consider the Defendants' alleged interests, as espoused on brief. Evans-Marshall, 428 F.3d at 231-32.  The Court also pointed out its precedent regarding disciplining a teacher's controversial speech, when that speech had received prior approval from the school district.  In general, the Sixth Circuit's previous cases establish that courts should not afford much weight to a school's alleged interest in disciplining a teacher, if the school previously approved the speech in question and then later took action as a result of a public outcry related to the same. Cockrel v. Shelby County Sch. Dist., 270 F.3d 1036, 1054 (6th Cir. 2001); Stachura v. Truszkowski, 763 F.2d 211, 214-15 (6th Cir. 1985),

25

rev'd on other grounds, 477 U.S. 299, 106 S. Ct. 2537 (1986).  Because there

was an indication of such a fact pattern, in the present Complaint, the Court

refused to grant the Defendants' Motion to Dismiss, on this point. Evans-Marshall,

428 F.3d at 232 (noting that the three novels and the movie, the teachings of

which the Complaint indicated were the reasons for the Plaintiff's dismissal, had

been purchased and approved of by the Board).


      i.      <u>Defendants' Interest in Disciplining Plaintiff for her
Speech</u>

In order to conduct the balancing test in question, the Court must presume

that the Defendants decided not to renew the Plaintiff's contract, at least in part,

because of her teachings of said materials.  At the outset, the Court notes that the

Defendants emphatically deny that they disciplined the Plaintiff as a result of such

speech. Doc. #38 at 30-34.  Recognizing that the Court will assume these facts for

purposes of conducting the balancing test, however, the Defendants argue, in

general, that case law recognizes that school boards have considerable leeway in

regulating classroom speech, in order to accommodate legitimate pedagogical

concerns, and more specifically, have the ability to select and require adherence to

a school board's stated curriculum. Doc. #38 at 31-32 (citing, among others,

Hazelwood Sch. Dist. v. Kuhlmeier, 484 U.S. 260, 273, 108 U.S. 562 (1988)

(noting that "educators do not offend the First Amendment by exercising editorial

control over the style and content of student speech in school-sponsored

expressive activities so long as their actions are reasonably related to legitimate pedagogical concerns" (student speech case));[14] Edwards v. Aguillard, 482 U.S. 578, 583, 107 S. Ct. 2573 (1987) (holding that "[s]tates and local school boards are generally afforded considerable discretion in operating public schools" (establishment clause case)); Lacks v. Ferguson Reorganized Sch. Dist. R-2, 147 F.3d 718, 724 (8th Cir. 1998) (finding that school board had legitimate academic interest in promoting generally acceptable social standards and, thus, could punish teacher for allowing profanity in student works (case involving teacher's First Amendment rights to allow student profanity in classroom written and video work))[15]; Webster v. New Lenox School Dist. No. 122, 917 F.2d 1004 (7th Cir.

_____

[14]There is a difference in analyzing student speech cases and teacher speech cases. Furthermore, there is a difference in analyzing different types of student speech cases. See Hazelwood Sch. Dist. v. Kuhlmeier, 484 U.S. 260, 273, 108 S. Ct. 562 (1988) (in cases involving educators' authority over school-sponsored speech, question is whether restrictions imposed are reasonably related to legitimate pedagogical concerns); Tinker v. Des Moines Indep. Cmty. Sch. Dist., 393 U.S. 503, 512-513, 89 S. Ct. 733 (1969) (in cases involving student speech that simply happens to occur on school premises, standard is whether the speech causes a material disruption or invades another's rights).

[15]In Lacks, a case with similar facts to the present case, the plaintiff high school English teacher permitted her students to use profanity in their presentation of student-authored short plays and permitted a student to read aloud his poem "which contained profanity and graphic descriptions of oral sex," and was subsequently fired for doing so. Lacks v. Ferguson Reorganized Sch. Dist. R-2, 147 F.3d 718 (8th Cir. 1998). In determining that the school district did not violate the teacher's First Amendment rights, the Eighth Circuit pointed out that the school board in question in that case, in its opinion terminating the teacher's employment,

wrote that the purpose of the board's disciplinary policies is "to establish, to foster, and to reflect the norms and standards of the community its serves. . . ." Allowing one student to call another a "fucking bitch" and a "whore" in front of the rest of the class, and

27

1990) (finding that state had compelling interest in selection of and requiring

adherence to suitable curriculum and that individual teachers did not have right to

make such curriculum choices (teacher classroom speech case)).

As to the Tipp Board of Education's specific interest in not renewing the

Plaintiff's contract, the Defendants point to, among other things, the provision in

the Ohio Revised Code that gives local school boards the responsibility of

---

allowing a student to read aloud a poem that describes sexual
encounters in the most graphic detail, as the students did in Lacks's
classroom, hardly promotes these shared social standards.  We
consider the matter too plain for argument.

Id. at 724.  In reaching its conclusion, the Appellate Court cited three Supreme
Court cases, to wit:

The Supreme Court has written that public education "'must inculcate
the habits and manner of civility as values in themselves conducive to
happiness and as indispensable to the practice of self-government in
the community and the nation.'" Bethel Sch. Dist. v. Fraser, 478 U.S.
675, 681, 106 S. Ct. 3159 (1986) (quoting C. Beard & M. Beard,
New Basic History of the United States 228 (1968)).  While students
in public schools do not "shed their constitutional rights to freedom of
speech or expression at the schoolhouse gate," Tinker v. Des Moines
Independent Community School District, 393 U.S. 503, 506, 89 S. Ct.
733 (1969), students' First Amendment rights "in schools and
classrooms must be balanced against the society's countervailing
interest in teaching students the boundaries of socially appropriate
behavior." Fraser, 478 U.S. at 681.  Accordingly, the Supreme Court
has held that "educators do not offend the First Amendment by
exercising editorial control over the style and content of student
speech in school-sponsored expressive activities so long as their
actions are reasonably related to legitimate pedagogical concerns."
Hazelwood School District v. Kuhlmeier, 484 U.S. 260, 273, 108 S.
Ct. 562 (1988).

Id.

28

prescribing school curricula and the Tipp City Board of Education policy that similarly provides as follows: "Legal responsibility for adoption of curriculum resides with the Board of Education." Doc. #38 at 32 (citing Ohio Rev. Code Ann. § 3313.60[16] and Doc. #37, Attach. #1 (Tipp Board Policy on Curriculum Adoption) at 9). The Defendants also point out that the elected School Board is accountable to the public for the education of the community's school children, whereas individual school teachers are not. Id. The thrust of the Defendants' argument here is that the Board is legally responsible for selecting its curriculum and is accountable to the community for so doing and, thus, its interest in controlling the curricular choices of its individual teachers outweighs the Plaintiff's claimed right to assign materials of her choosing.

The Defendants also argue that the actions complained of as retaliation were simply the result of the Defendants performing their required duties as administrators of their school system and that the they had an interest in properly administering such. For example, the Defendants point to the fact that Board policy specifically assigns the principal the role of conferring with teachers as to the advisability of teaching certain controversial issues.[17] Doc. #37, Attach. #1 at

---

[16]In pertinent part, Section 3313.60 provides as follows: "The board of education of each city and exempted village school district . . . shall prescribe a curriculum for all schools under [its] control." Ohio Rev. Code. Ann. § 3313.60(A).

[17]After setting forth several guidelines for teachers to follow in determining whether inclusion of controversial materials in teaching assignments is appropriate, the pertinent portion of the Policy provides as follows: "A teacher who is in doubt about the advisability of discussing certain issues in the classroom should confer

23 (Tipp Board Policy re. Teaching about Controversial Issues). It is also the principal's job to conduct periodic observations of teachers and to make suggestions for improvements. Doc. #38 at 33 (citing Evans-Marshall v. Bd. of Educ., 2003 Ohio App. LEXIS 4496, *10 (Ohio 2nd App. Dist. Sept. 19, 2003), and Ohio Rev. Code Ann. § 3319.111).[18]

In opposition to the Defendants' arguments, the Plaintiff states that although it is true that the Board has authority to set its curriculum, it delegated the day-to-day implementation of the specifics of curricular choices to the individual teachers. Doc. #41 at 34-37. In support of this statement, the Plaintiff points to the Board's Policy, which provides that it "delegates to the professional personnel of the District authority for the selection of instructional and library materials."[19] Doc.

---

with the principal as to the appropriateness of doing so. If discussion of an issue is not approved by the building principal, the teacher may refer the issue to the Superintendent." Doc. #37, Attach. #1 at 23.

[18]As recognized by Ohio's Second District Appellate Court in the earlier case in state court, involving these parties, the Ohio Revised Code states that a "limited contract teacher[] should receive a written report documenting her evaluation. The written report must include 'specific recommendations regarding any improvements needed in the performance of the teacher being evaluated and regarding the means by which the teacher may obtain assistance in making such improvements.'" Evans-Marshall v. Bd. of Educ., 2003 Ohio App. LEXIS 4496, *10 (Ohio 2nd App. Dist. Sept. 19, 2003) (quoting Ohio Rev. Code Ann. § 3319.111(B)(3)).

[19]The entirety of the context of that statement, from the Board Policy provides as follows:

> As the governing body of the District, the Tipp City Exempted Village Board of Education is legally responsible for the selection of instructional materials. Since the Board is a policy-making body, it delegates to the professional personnel of the District authority for the selection of instructional and library materials.

#37, Attach. #1 at 16 (Tipp Board Policy re. Instructional Materials). The Plaintiff also states that it was the practice in the District for the Board to adopt a textbook for each course and then to allow the teachers to supplement the textbook with materials of their choosing, in order to achieve the general goals and objectives of each course. Doc. #32, Attach. #1 (Zigler Dep.) at 79; Doc. #36, Attach. #1 (Bishop Dep.) at 30, 60.

The Plaintiff also argues that the School District expected controversial issues to be included in the curriculum, as evidenced by the Board's Policy that states that "[o]nly through the study of [some controversial issues] will youth develop the abilities needed for citizenship in our democracy."[20] Doc. #37, Attach.

---

Materials for school classrooms and school libraries will be selected by the appropriate professional personnel in consultation with the Superintendent, faculty and other sources as needed. Final decision on purchase will rest with the Superintendent, subject to official adoption by the Board in the case of textbooks.

The Board believes that it is the responsibility of the District:

1.    to provide materials that will enrich and support the curriculum, taking into consideration the varied interests, abilities and maturity levels of the students served;

2.    to provide materials that will stimulate growth in factual knowledge, literary appreciation, aesthetic values and ethical standards; . . .

The above principles . . . will serve as a guide in the selection of all instructional [materials].

Doc. #37, Attach. #1 at 16 (emphasis added).

[20]In context, that statement reads as follows:

#1 at 387 (Tipp Board Policy re. Teaching Controversial Issues).

ii.    Plaintiff's Interest in Speaking as She Did

The Plaintiff does not clearly articulate her "interests in speaking as she did," so, in order to conduct the necessary balancing test, it is left to the Court to piece together what appears to be her interest in teaching the disputed materials.[21]  Upon a review of the Rule 56 materials on the record that are offered in support of the general arguments made in the Plaintiff's brief, the Court concludes that the Plaintiff seems to be asserting that she had an unequivocal right to select materials to supplement the Board-chosen textbooks for each of her classes and the methods for teaching the same. Doc. #1 (Compl.) ¶ 32 ("A central tenet of academic

---

Most of the Tipp City Exempted Village School District curriculum is composed of established truths and accepted values, but it also includes controversial issues.  The public schools include the study of some important unsolved problems that involve controversial issues. Only through the study of such issues will youth develop the abilities needed for citizenship in our democracy.

Doc. #37, Attach. #1 at 387.  The Policy goes on to provide that teachers will use certain criteria for determining the appropriateness of issues for consideration as part of the curriculum, to include whether the issues are in "the range, knowledge, maturity and competence of the students." Id.

[21]In the section of the Plaintiff's Memorandum in Opposition entitled "Plaintiff's Interest in Speech Outweighed the School District's Interest in Regulating Plaintiff's Speech," the Plaintiff does not articulate any "interest" she had in teaching the disputed materials; rather, the entirety of her argument is devoted to assertions of why the Defendants' stated interests in regulating the Plaintiff's speech are improper. See Doc. #41 at 34-37.  The arguments presented here are ones that the Court has gleaned from other portions of the Plaintiff's Memorandum, supporting evidentiary materials and the Complaint.

freedom is the ability of the teacher to select books and methods of instruction for use in the classroom without interference from public officials."). In particular, the Plaintiff implies that she had the right to teach controversial topics of her choosing, apparently in the manner she wanted and without interference from school officials. Doc. #41 at 32-33 (citing Doc. #31, Attach. #1 (Evans-Marshall Dep.) at 95, in support of the statement that "Plaintiff believe[s] that students have the right to learn to express themselves well on any topic and that she, as an instructor, has a vested interest in empowering her students to do so.").[22]

In support of these views, the Plaintiff points to the fact, as highlighted above, that the Tipp Board had an open-ended curriculum that focused on the skills students needed to learn each year, while allowing the teachers the latitude to supplement the textbooks with other materials of their choosing. Doc. #32, Attach. #1 (Zigler Dep.) at 78-79; Doc. #36, Attach. #1 (Bishop Dep.) at 30. The Plaintiff also points to the Board's policy that gives students certain "rights" in the study of controversial materials, to wit:

1.    the right to study any controversial issue that has political,

---

[22]With regard to the <u>Heather</u> book, the Plaintiff's brief provides that "<u>Heather</u> dealt with alternative families, a pertinent contemporary issue that Plaintiff felt should be debated." Doc. #41 at 31 (citing Doc. #31, Attach. #1 (Evans-Marshall Dep.) at 116)).

As to the two student-authored articles in question, the Plaintiff implies that she had an interest in teaching the students in her college preparatory American literature class about "media literacy," by "helping them distinguish gratuitous sex or violence - - which they met in the media every day - - and sex or violence which is presented in an artistic form in pursuit of a theme." <u>Id.</u> at 25 (citing Doc. #31, Attach. #1 (Evans-Marshall Dep.) at 92, 121-25)).

33

economic, or social significance and concern, of which (<u>at the student's level</u>) he should begin to have an opinion;

2.      the right to have free access to all relevant information, including the materials that circulate freely in the community;

3.      the right to study under competent instruction in an atmosphere free from bias and prejudice and

4.      the right to form and express his own opinions on controversial issues without thereby jeopardizing relations with his teachers or the school.

Doc. #37, Attach. #1 at 387 (Tipp Board Policy on Teaching about Controversial Issues) (emphasis added).

### iii.      Balancing of Interests

In sum, the Defendants argue that they have an interest in controlling their teachers' curricular choices, because the Board of Education is accountable for the District's curriculum in the eyes of Ohio statutory law and internal policy, as well as being generally accountable for such to its constituents in the community.  The Defendants also argue that they have an interest in the day-to-day administration of the District (*e.g.*, conferring with teachers as to the advisability of teaching certain matters and proposing ways, in general, in which teachers might make improvements).  The Plaintiff, on the other hand, asserts that she has an interest in supplementing the prescribed classroom textbooks with the materials and methods of instruction that she chooses, in accordance with various Board policies.

Upon consideration of these stated interests, the Court concludes,

34

notwithstanding the issue of whether the Board pre-approved the teaching of certain materials (the concern highlighted by the Sixth Circuit in Cockrel v. Shelby County School District, 270 F.3d 1036, 1053-54 (6th Cir. 2001)), which will be addressed forthwith, that the Board's interest in regulating the Plaintiff's selection of instructional materials and methods of instruction far outweighed the Plaintiff's right to use whatever supplemental materials and methods she chose.  While the Board's regular practice might have been to allow its teachers the latitude to select supplemental materials and incorporate instructional methods of their choosing, this does not give a teacher the "right" to do so, if the administrators or the Board do not approve of such selections.  For example, a Spanish teacher should not have the "right" to supplement his Spanish textbook with instructional materials on how to speak Japanese, if the administrators do not approve.  Or, a trigonometry teacher who decides that mathematical basics are "passe" should not have the "right" to implement a supplemental new-wave method of teaching mathematics, if the Board does not concur.  The Court sees little difference in directing an English teacher as to the kinds of supplemental materials and methods she may or may not use, in order to achieve the curricular goals that the Board is ultimately responsible for establishing and implementing, for any given course.[23]

_____

[23]Although neither the Supreme Court nor the Sixth Circuit has directly addressed the balance between a public primary or secondary school district's interest in dictating the curricular speech of its teachers with a teacher's interest in independently choosing such curriculum, without the factual component of preapproval of the speech in question, this holding is in concert with both Supreme Court and Sixth Circuit decisions on similar issues, as well as with other appellate courts that have directly addressed the issue. See Hazelwood Sch. Dist. v.

_____

Kuhlmeier, 484 U.S. 260, 267, 108 S. Ct. 562 (1988) (recognizing, in student speech case, that "[t]he determination of what manner of speech in the classroom . . . is inappropriate properly rests with the school board . . . ." (internal quotation omitted)); Cockrel v. Shelby County Sch. Dist., 270 F.3d 1036, 1054 (6th Cir. 2001) (in teacher speech case, involving pre-approval of disputed speech, stating that, "[w]hile ordinarily we would give substantial weight to the government employer's concerns of workplace efficiency, harmony, and discipline in conducting our balancing of the employee's and employer's competing interests, we cannot allow these concerns to tilt the Pickering scale in favor of the government, absent other evidence, when the disruptive consequences of the employee speech can be traced back to the government's express decision permitting the employee to engage in that speech"); Stachura v. Truszkowski, 763 F.2d 211, 215 (6th Cir. 1985), rev'd on other grounds, 477 U.S. 299, 106 S. Ct. 2537 (1986) (same general holding, on similar facts).

    Minarcini v. Strongsville City School District, 541 F.2d 577 (6th Cir. 1976), involved a suit brought by high school students against the school board and administrators claiming a violation of their First Amendment rights because, among other things, the Board had not approved of certain textbooks for inclusion in the curriculum, which had been requested by the faculty.  In ruling against the plaintiffs, on this point, the Court stated,

> Clearly, discretion as to the selection of textbooks must be lodged somewhere and we can find no federal constitutional prohibition which prevents its being lodged in school board officials who are elected representatives of the people.  To the extent that this suit concerns a question as to whether the school faculty may make its professional choices of textbooks prevail over the considered decision of the Board of Education empowered by state law to make such decisions, we affirm the decision of the District Judge in dismissing that portion of plaintiffs' complaint.  In short, we find no federal constitutional violation in this Board's exercise of curriculum and textbook control as empowered by the Ohio statute.

Id. at 579-80; see also Lee v. York County Sch. Div., 484 F.3d 687, 695 (4th Cir.), cert. denied, 128 S. Ct. 387 (2007) (concluding that "public schools possess the right to regulate speech that occurs within a compulsory classroom setting, and . . . a school board's ability in this regard exceeds the permissible regulation of speech in other governmental workplaces or forums"); Mayer v. Monroe County Cmty. Sch. Corp., 474 F.3d 477, 479 (7th Cir.), cert. denied,128 S. Ct. 160 (2007) ("[T]hose authorities charged by state law with curriculum development [may] require the obedience of subordinate employees, including the classroom teacher." (internal quotation omitted)); Edwards v. California Univ., 156 F.3d 488,

Furthermore, while the Board's policy might have outlined certain students' "rights" with regard to the study of controversial topics, those "rights" were tempered with the proviso that such instruction be age appropriate.  If a teacher and an administrator or a school board differ in what they believe falls within the range of "age appropriate" teaching materials, the board's determination (or the determination of its chosen administrators) should control, for it is the board that is ultimately responsible for the education of the students, not the teacher.[24]

_____

491 n.1 (3d Cir. 1998) (recognizing that "public school teachers must abide by school policy or dictates when choosing their curriculum [and] . . . that a public school teacher's in class conduct is not protected by the First Amendment (internal quotation omitted)); Bishop v. Aronov, 926 F.2d 1066, 1073 (11th Cir. 1991) (holding that "where the in-class speech of a teacher is concerned, the school has an interest . . . in scrutinizing expressions that the public might reasonably perceive to bear its imprimatur" (internal quotation omitted)).

[24]On this point, the Seventh Circuit recently provided the following commentary:

> Majority rule about what subjects and viewpoints will be expressed in the classroom has the potential to turn into indoctrination; elected school boards are tempted to support majority positions about religious or patriotic subjects especially.  But if indoctrination is likely, the power should be reposed in someone the people can vote out of office, rather than tenured teachers.  At least the board's views can be debated openly, and the people may choose to elect persons committed to neutrality on contentious issues. . . .  The Constitution does not entitle teachers to present personal views to captive audiences against the instructions of elected officials.

Mayer v. Monroe County Cmty. Sch. Corp., 474 F.3d 477, 480-81 (7th Cir.), cert. denied 128 S. Ct. 160 (2007).  In the present case, the issue is not whether the Plaintiff was expressing her own viewpoints about the subject matters in question (homosexuality, rape, violence, etc.), but whether teaching such subjects should be part of the curriculum to the extent the Plaintiff was including them.  The Court finds very little difference in regulating a teacher's spoken personal viewpoints about certain subjects and her choice of supplemental materials or methods of

Thus, as long as the materials do not otherwise fall within the "pre-approved materials" caution, as noted by the Sixth Circuit in the previous decision in this case and in Cockrel v. Shelby County School District, 270 F.3d 1036, 1053-54 (6th Cir. 2001), the Pickering-Connick balance weighs in favor of the Defendants and the granting of the Defendants' Motion for Summary Judgment is warranted.

When conducting the Pickering-Connick balancing test in Cockrel, the case upon which a good portion of the previous Appellate Court decision in this case was based, the Sixth Circuit balanced the school system's interest in workplace efficiency, harmony, and discipline against the teacher's interest in teaching her students about industrial hemp.[25] Cockrel, 270 F.3d at 1053-54. Although the Court determined that both of the parties' interests were important and recognizable, it ultimately concluded that the scale tipped in favor of the plaintiff, finding that it would be unfair to discipline the teacher for the disruptive consequences of her industrial hemp presentations when the school district had

---

instruction about teaching certain subjects. In either instance, the elected board of education should have the ultimate say as to whether the "speech" is both age appropriate and well-suited to the overall school curriculum.

[25]Hemp is a plant that produces both marijuana and fibers that can be used to make various goods, such as paper and clothes. Cockrel v. Shelby County Sch. Dist., 270 F.3d 1036, 1042 (6th Cir. 2001). At the time of the Cockrel case, hemp was an illegal substance in Kentucky, although controversy surrounded the banning of this substance, because of the environmental benefit of using the industrial components of the hemp fibers as an alternative to the use of trees. Id. at 1042-43. The Court concluded that the teacher's speech concerning the use of industrial hemp "substantially involved matters of significant public concern in Kentucky." Id. at 1053.

given her permission for such speech. Id. at 1054-55.

Thus, the Court, in this case, must determine whether any of the "speech" in dispute was pre-approved by the Defendants and, if so, what effect that has on the Pickering-Connick balance.  As to three of the five materials in dispute - - - the Heather book and the two student-authored stories - - - there is no dispute that the school district did not give prior permission for the Plaintiff to present these to her class.  Thus, the Defendants were justified in disciplining her for such speech, to the extent they did, as a result of the Pickering-Connick balancing test.

The fourth item in question is the Romeo and Juliet video.  The facts indicate that the school had given teachers general permission to show videos rated PG-13 and that this movie was rated PG-13.  Doc. #32, Ex. B at 20 (Video Rating Policy).  The only objection the Plaintiff indicates with regard to this video is that she was required to omit a portion of the movie that contained nudity, when she showed it to her ninth grade English class.[26] Doc. #31, Attach. #1 (Evans-Marshall Dep.) at 122 (explaining that she felt it important to show the nudity, so the students might be able to distinguish between the gratuitous display of nudity

---

[26]The Plaintiff also points out that the principal questioned her about the rating of the video, after she showed it to her students. Doc. #41 at 19, 31.  It is unclear what the Plaintiff is implying by highlighting this point.  The Court concludes that it was well within the province of a school principal to inquire of a teacher as to the rating of a video that she showed to her class, particularly in light of the fact that PG-13 videos had been pre-approved for viewing, but videos with more mature ratings had not.  Since the Plaintiff does not expound on the importance of this fact, the Court will disregard it in drawing its conclusions herein.

and art). While the general "preapproval" to show PG-13 videos would seem to indicate that this video would fall within the <u>Cockrel</u> rubric, the Court is reluctant to jump to that conclusion based on these alleged facts. The Plaintiff does not imply that her contract was not renewed because she chose to show the <u>Romeo and Juliet</u> video (that implication is made about the teaching of the other four materials, but not this video). Rather, the Plaintiff only complains that she was restricted from showing the entirety of the video. The Court does not read the <u>Cockrel</u> decision so broadly as to apply to these facts. Had the Board disciplined the Plaintiff after she showed the pre-approved video, <u>Cockrel</u> would apply. Instead, the administration regulated a portion of the "speech" prior to the Plaintiff's presentation of the same - - - a prior restriction rather than a later disciplinary measure. Reverting back to the previous analysis, the Court concludes that the Plaintiff had no "right" to show the entirety of the video simply because it fell within the general preapproval of all PG-13 videos. If the Board or its administrators felt it appropriate to excise certain parts of the video, because, for example it contained age inappropriate nudity, they had an interest in doing so that outweighed any interest the teacher had in presenting it. Thus, the Defendants were justified in restricting the Plaintiff's speech on this matter.

Finally, the Court turns to the Plaintiff's teaching of the book <u>Siddhartha</u>. Without a doubt, the Defendants gave the Plaintiff permission to teach this book, in that the District had purchased quantities of such several years before and made

40

it available to teachers as an optional text.  Therefore, based on the Sixth Circuit's instruction in <u>Cockrel</u>, the Court will not tip the scales in favor of the Defendants' stated interests in selecting and requiring adherence to its curriculum and efficiently administering the District, when it previously gave the Plaintiff permission to teach this book and then later allegedly disciplined her for so doing.

In sum, then, at this point in the analysis, the Court concludes that the Defendants' request for summary judgment is well taken, as to the Plaintiff's assertions that the Defendants disciplined her for exercising her First Amendment rights, with regard to the teaching of <u>Heather Has Two Mommies</u>, the student-authored story about the rape, the student-authored story about the murder of the priest and the desecration of the crucifix, and the <u>Romeo and Juliet</u> video. However, the Plaintiff has satisfied the first element of her *prima facie* case, by demonstrating that she was engaged in constitutionally protected activity, as to her allegations pertaining to her teaching of the book <u>Siddhartha</u>.  Therefore, the Court will now proceed with the remaining steps of the *prima facie* analysis, with regard to the Plaintiff's assertions regarding that book.

2.      Whether Defendants' Adverse Action Caused Plaintiff to Suffer Injury that would likely Chill Person of Ordinary Firmness from Continuing in Activity

As was previously indicated, the Sixth Circuit has held that non-renewal of a teaching contract is "an injury that would likely chill a person of ordinary firmness from continuing in [the] activity." Evans-Marshall, 428 F.3d at 232 (quoting Cockrel, 270 F.3d at 1055).  Thus, the Plaintiff has satisfied the second step of her *prima facie* case of First Amendment retaliation and the Court will turn to an analysis of the final step.

3.      Whether Plaintiff's Non-Renewal was Motivated at Least in Part as Response to Her Exercise of Constitutional Rights

In order to satisfy the third element of her *prima facie* case, the Plaintiff must not rely simply on the fact that the non-renewal decision was made after she taught Siddhartha, but rather a preponderance of the evidence must link her teaching of that book with the Board's decision. Cockrel, 270 F.3d at 1055 (quotation omitted).  Stated another way, the third element requires the Plaintiff to demonstrate that there is a "causal connection" between her teaching Siddhartha and her non-renewal. Arnett v. Myers, 281 F.3d 552, 560 (6th Cir. 2002).

The Plaintiff has not concisely framed an argument in support of the third element of her *prima facie* case, so the Court will attempt to discern whether she has set forth sufficient evidence in support of the general arguments scattered

42

throughout her brief, to create a genuine issue of material fact as to this issue.[27]

Some of the facts that the Plaintiff alleges are tied to her teaching of Siddhartha

have no link to that book except the temporal proximity of the events and, thus,

are insufficient to support her argument.[28] E.g., Doc. #41 at 3 (alleging that she

received low marks on her performance evaluations after the public controversy

ensued about various books); 8-9 (asserting that her relationship with Wray

deteriorated after October Board meeting), 20 (suggesting that Plaintiff's lesson

plans were not an issue until after the Siddhartha controversy). Some of the facts,

however, possibly link the Plaintiff's teaching of Siddhartha to the Defendants'

decision to not renew her teaching contract, to wit: Principal Wray stated at an

English faculty meeting, immediately after the October Board meeting, that the

_____

[27]The first 27 pages of the Plaintiff's brief (Doc. #41) contain a detailed explanation of the facts. The remaining 13 pages comprise her argument, wherein she ends her discussion of her *prima facie* case after the section devoted to whether her non-renewal would chill future expression, skipping the third step, to wit: whether the alleged adverse employment action was motivated at least in part as a response to the exercise of her constitutional rights. See id. at 37.

[28]The Plaintiff also seems to be arguing that she was singled out by the Principal for unnecessary criticism and monitoring. For example, she argues that the Principal unfairly criticized her alternative book assignment selection for Siddhartha (which was a book appropriate for 9-12 year olds, whereas her ninth grade students were primarily 14-15 years old), as being too elementary. Doc. #41 at 10. The Plaintiff also argues that Wray instructed her to check with a superior before using any potentially controversial materials in the future and that such a requirement was not imposed on other members of the English department faculty. Id. at 12. Because these facts would arguably support a claim of improperly regulating First Amendment speech (a claim that the Plaintiff has not made in her Complaint), rather than supporting her claim that the Board did not renew her contract for the exercise of protected speech, the Court will not consider them in its analysis here.

43

Plaintiff was "on the hot seat" for parental complaints about Siddhartha and,

further, according to the Plaintiff's testimony, Wray told her that he objected to her

selection of Siddhartha, as well as to the discussions that went along with teaching

the themes of that book.[29] Doc. #31, Attach. #1 (Evans-Marshall Dep.) at 64-65;

74-75, 100-01.

    In response, the Defendants argue that, as to the "hot seat" comment, the

Plaintiff has presented no evidence to suggest that Wray was upset with her when

he made this comment; rather, the public concern expressed at the October Board

meeting had placed Plaintiff on the "hot seat" and the principal's comment was one

of fact, not animosity. Doc. #44 at 3.  In further support of this conclusion, the

Defendants point out that Wray conducted an official written "observation" of the

_____

    [29]As to Wray objecting to her teaching Siddhartha, as well as to her method
of teaching that book, the Plaintiff testified as follows:

> Plaintiff: [Wray] verbally told me that . . . he didn't like that I had
> done the [100 most challenged book project].  He didn't like
> that I had chosen Siddartha.  He doesn't like the discussions
> that go along with the themes in all of those books going on
> in class, and that he intended to reign it in.
> Counsel: What discussions did he object to?
> Plaintiff: Which book do you want to talk about?
> Counsel: Pick one.
> Plaintiff: All right. Well, Siddartha, you're discussing issues of
> spirituality, Buddhism, romantic relationships, personal
> growth, familial relationships.  We had discussions about all
> of that going on in class.  Parents and Charles Wray
> objected.

Id. (Evans-Marshall Dep.) at 100-01.

Plaintiff two weeks after the October Board meeting, in which he made no reference to the Siddhartha controversy and reflected only positive comments about the Plaintiff. Doc. #31, Ex. C, pt. 2 at 5 (Nov. 13, 2001, Teacher Observation Log).  Furthermore, despite the Plaintiff's allegations to the contrary, neither the Plaintiff nor the Siddhartha book were a point of any significant discussion at the November Board meeting; rather that meeting primarily focused on disgruntled parents' concerns over several junior high school library books.[30] Doc. #37, Ex. #1 (Nov. 26, 2001 Bd. Mtg. DVD; filed manually).[31]  It was not until mid-December that Wray was first critical of the Plaintiff, in his second "observation" of her for that school year and for reasons unrelated to Siddhartha. Doc. #1 ¶ 17.

_____

[30]In the Complaint, the Plaintiff alleges as follows:

> At the November 26, 2001, Board meeting, approximately 100 parents were in attendance to protest the presence of materials in classes and school libraries that the parents thought obscene. . . .  At the meeting, parents presented a petition of 500 signatures calling for decency in education.  The focus of the parents' concern was subject matter presented in Plaintiff's classes.

Doc. #1 ¶ 16.

[31]The Defendants have filed manually with the Court a DVD of the November Board meeting.  The Court has watched the entirety of this DVD and agrees with the Defendants' contention that this Board meeting was primarily focused on the junior high library book controversy.  Only one parent made specific reference to the Siddhartha book, but not to the Plaintiff by name.  This parent's main complaint was with the alternative book that had been assigned when requested, as being too elementary, that her daughter felt as if she had been punished for seeking an alternative assignment, and that the assignment for the alternative book was incomprehensible to both the student and the parent.

The Defendants further point to the fact that, contrary to the Plaintiff's unfounded assertions,[32] the administration consistently supported the Plaintiff's teaching of Siddhartha, as evidenced by Superintendent Zigler's comment at the October Board meeting noting that since the book was purchased by the District, its selection had nothing to do with an individual teacher. Doc. #32, Attach. #1 (Zigler Dep.) at 16-17.  At that meeting and the November Board meeting, the Board also made it clear that it did not intend to pull the book from the curriculum, but offered parents the option of requesting an alternative reading assignment, if they desired. Id. at 23, 35, 67.  The Defendants also point out that when questioned as to whether he or anyone else in the administration was aggravated with the Plaintiff for having made the Siddhartha assignment, Superintendent Zigler replied,

> Not at all. . . . [T]hese are our books , we've purchased these.  I had a bigger issue with the middle school book that was brought up [at the Board meeting]. . . . [W]hat did we miss here that we couldn't make a better selection of more appropriate reading material for middle school kids?  There are many books out there.  But Siddhartha had been in the district for years.

Id. at 68.  Furthermore, at least one other teacher had taught the book in previous years, apparently without incident. Doc. #33, Attach. #1 (Wray Dep.) at 53.

---

[32]As support for her assertion that Principal Wray told her that he did not support her choice of Siddhartha, nor her teaching methodologies therefor, the Plaintiff offers her own deposition testimony. See Doc. #31, Attach. #1 (Evans-Marshall Dep.) at 64-65; 74-75; 100-01.

The Defendants continue their argument by pointing out that the Plaintiff's position is geared toward the principal's apparent stance on the <u>Siddhartha</u> assignment and controversy, but the Superintendent and the Board had to concur in the non-renewal decision and the Plaintiff has offered no evidence to indicate that their concurrence in that decision was in any way motivated by that curricular choice. <u>See</u> Doc. #32, Attach. #1 (Zigler Dep.) at 90-94 (stating that it was his understanding that Wray's nonrenewal recommendation was not in any way motivated by Plaintiff's curricular decisions).

Upon consideration of the evidence pointed to by each of the parties, the Court concludes that the Plaintiff has not set forth a preponderance of the evidence that links her teaching of <u>Siddhartha</u> with the Board's decision to not renew her contract.[33] <u>Cockrel v. Shelby County Sch. Dist.</u>, 270 F.3d 1036, 1055 (6th Cir. 2001) ("[T]o survive defendants' motion for summary judgment, [the plaintiff] must present sufficient evidence to allow a reasonable factfinder to conclude, by a preponderance of the evidence, that her speech, at least in part, motivated the defendants to discharge her.").  On the contrary, the evidence leans decidedly the other way, in indicating that the non-renewal decision was in no way motivated by the Plaintiff's teaching of <u>Siddhartha</u>.

---

[33]This is another way of saying that the Court has construed the evidence most strongly in favor of the Plaintiff and has concluded that there is no genuine issue of material fact, as to this issue.

Because the Plaintiff has not set forth a genuine issue of material fact as to her *prima facie* case of First Amendment retaliation, the Defendants' Motion for Summary Judgment (Doc. #38) is SUSTAINED.  Based on the Court's decision herein, it is unnecessary for the Court to address the issue of qualified immunity.


IV.    CONCLUSION

The Defendants' Motion for Summary Judgment  (Doc. #38) is SUSTAINED. Judgment is to be entered on behalf of the Defendants and against the Plaintiff.

The above captioned cause is hereby ordered terminated upon the docket records of the United States District Court for the Southern District of Ohio, Western Division, at Dayton.


July 30, 2008


  /s/ Walter Herbert Rice    
WALTER HERBERT RICE, JUDGE
UNITED STATES DISTRICT COURT


Copies to:
Counsel of record